**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALLRICH JEAN, as Administrator for The ESTATE OF ARMANI FAISON, | : : : | |
| | : | Civil Action No. |
| Plaintiff, | : : | |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| THE CITY OF PHILADELPHIA | : | |
| | : | |
| And | : | |
| | : | |
| WARDEN MICHELE FARRELL, | : | |
| | : | |
| And | : | |
| | : | |
| WARDEN NANCY GIANETTA, | : | |
| | : | |
| And | : | |
| | : | |
| PRISON COMMISSIONER BLANCHE CARNEY, in her individual capacity, | : : : | |
| | : | |
| And | : | |
| | : | |
| JOHN DOE C.O.s #1-3 | : | |
| | : | |
| Defendants. | : : | |

## PLAINTIFF'S COMPLAINT

NOW COMES Allrich Jean, as Administrator for the Estate of Armani Faison, complaining of Defendants Curran-Fromhold Correctional Facility, Philadelphia Department of Prisons, the City of Philadelphia, Warden Michele Farrell, Warden Nancy Gianetta, Prison

_____

Plaintiff's Complaint                                                                                    1

Commissioner Blanche Carney, and John Doe C.O.s #1-3 and for cause would show the Honorable Court as follows:

## INTRODUCTION

1. In late March of 2021, Armani Faison was arrested for shoplifting charges and sent to Curran-Fromhold Correctional Facility.  He was assigned to a cell with Kevin Massey who two days before had attempted to rape his cellmate.  On March 27th, Massey raped again.  Massey repeatedly raped Armani Faison for hours as his screams for help and those of inmates housed nearby went unanswered.  The rape only subsided when Massey murdered Armani.  Armani's body was found the following morning naked, bloodied, and floating in six inches of water.

2. That such a horrific occurrence could continue for hours without intervention in the Philadelphia Department of Prisons is the shocking but predictable result of the City's consistent practice of massively understaffing its jails.   The block to which Mr. Faison was assigned was intentionally left completely unattended by prison staff throughout the night – a decision so shocking that it compelled retired CFCF Warder John Delaney to declare to the Philadelphia Inquirer that "At no time should a housing area in any facility within the Philadelphia Department of Prisons be left unmanned for any extended period of time. This not only compromises the health and welfare of the inmates assigned to that area, but it also jeopardizes the safety and security of the facility and places staff in unnecessary risk."

3. This is an action brought by the Plaintiff against the Defendants for their failure to protect Armani Faison from known and obvious risks which resulted in his rape and murder.

---

These claims are brought under the Fourteenth Amendment of the United States Constitution and state law.

4. Plaintiff brings this action pursuant to Pennsylvania's survivorship statutes as the duly appointed administrator of the Estate of Armani Faison.

5. Plaintiff brings this action pursuant to Pennsylvania's wrongful death statute on behalf of Mr. Faison's wrongful death beneficiaries.


## PARTIES

6. Plaintiff, Allrich Jean, is the duly appointed administrator of the Estate of Armani Faison and is an adult individual and a resident of the state of New Jersey.

7. Armani Faison died intestate. He was unmarried and had no children. He was survived by his father, Allrich Jean, and his mother, Daisy Faison.

8. Defendant, City of Philadelphia, a City of the First Class organized and existing under the laws of the Commonwealth of Pennsylvania was responsible for the creation and operation of the Philadelphia Department of Prisons including, but not limited to, the Curran-Fromhold Correctional Facility ("CFCF"). CFCF is located at 7901 State Road, Philadelphia, Pennsylvania.

9. Defendant, Warden Michele Farrell, was at all times relevant hereto, the Warden for the Curran-Fromhold Correctional Facility, responsible for the assignments, staffing, and operations of CFCF.

10. Defendant, Warden Nancy Gianetta, was at all times relevant hereto, the Deputy Warden for Admissions and Diagnostics at the Curran-Fromhold Correctional Facility, responsible for ensuring inmate placement and safety.

11. Defendant, Prison Commissioner Blanche Carney, was at all times relevant hereto, the Commissioner for the Philadelphia Department of Prisons of the City of Philadelphia. Defendant Carney was the final policymaker on correctional officer staffing levels within the Philadelphia Department of Prisons.

12. Defendant John Doe C.O. #1 is the corrections officer assigned to Armani Faison's unit who abandoned the unit on the night of his death without ensuring a replacement officer was present.

13. Defendant John Doe C.O.#2 is the corrections officer who ordered John Doe C.O.#1 to leave the unit and relocate to the kitchen on the night of Armani Faison's death.

14. Defendant John Doe C.O.#3 is the corrections officer who assigned Armani Faison to the same cell as Kevin Massey.

## JURISDICTION AND VENUE

15. Jurisdiction exists in this Honorable Court pursuant to 28 U.S.C. § 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of the Fourteenth Amendment rights of the decedent Armani Faison. Plaintiff further invokes supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to adjudicate pendent state law claims.

16. Venue is proper in this Honorable Court as Defendants' constitutional violations and intentional torts and otherwise violative conduct occurred within the Eastern District of Pennsylvania.

## KEVIN MASSEY'S ATTEMPTED RAPE OF K.S. AND THE CITY'S RESPONSE

17.     On March 24, 2021, Kevin Massey was assigned to CFCF B1 Pod 2.

18.     Massey was house in Cell #10 with K.S.

19.     In the early hours of the morning of the 24th, Massey sexually assaulted K.S.

20.     K.S. reported the assault to Lt. Murray, Sgt. Dekeyser, and Sgt. Barbour.

21.     In response to the reported sexual assault, the City did not place Massey in administrative or disciplinary segregation.

22.     Rather, the City simply moved K.S. out of the cell and assigned a new inmate to Cell #10.  That inmate was Armani Faison.


## THE RAPE AND MURDER OF ARMANI FAISON

23.   On or about March 24, 2021, Armani Faison was arrested for shoplifting related offenses, and after being unable to post bond was sent to CFCF.

24.   Once booked into the facility, Mr. Faison was subject to an initial evaluation.

25.   Medical records from the facility indicate that City officials were aware that Armani Faison suffered from mental health issues.

26.   The records further indicate Social Worker Douglas Ford evaluated Faison and concluded that Faison was engaging in "Bizarre Behaviors, which may aggravate others putting his safety in danger."

27.   Despite these concerns, the City acting through Defendant Gianetta and John Doe #3, placed Faison into Cell #10 with Kevin Massey mere hours after Massey's sexual assault of K.S.

28.   No other inmates were assigned to Cell #10.

_____

29. At approximately 12 a.m. on March 27, 2021, the lights to the cellblock housing Cell #10 were shut off.

30. According to various witness statements, shortly after the lights went out inmates heard screaming from Cell #10.

31. Accounting for varying witnesses, between 12 a.m. and 4:30 a.m. on March 27, 2021, Mr. Faison screamed for help, called for the guard, and banged on his cell repeatedly. During that time, Mr. Faison was brutally raped, beaten and choked by Massey.

32. The assault lasted for several hours.

33. C.O. John Doe #1 was assigned to monitor the cell block but was reassigned to a different area of the prison by C.O. John Doe #2.

34. This left the cell block completely unattended and unmonitored for the duration of the multi-hour rape and murder.

35. At some point between 2 a.m. and 3 a.m., other inmates reported hearing the sprinkler system in Cell #10 turn on.

36. As the attack continued through the early hours of the morning, other inmates in neighboring cells reported that they also banged on their cells and yelled for help from guards for Mr. Faison.

37. It was not until approximately 7:38 a.m. the following morning that a guard returned to check on the cell block.

38. C.O. Melton arrived for his scheduled shift and began checking the cells in B1 Pod 2.

39.  Upon arriving at Cell #10, he found Armani Faison naked and unresponsive on the floor of Cell #10, face down in several inches of water.

_____

40. Upon finding Mr. Faison, additional assistance was called. When removing Mr. Faison and Massey from the cell, another inmate in a neighboring cell reportedly yelled that Mr. Faison had been "shouting for hours."

41. Mr. Faison was transported to Nazareth Hospital where he was pronounced dead at 9:45 a.m. on March 27, 2021.

42. Mr. Faison's injuries included abrasions and contusions to his nose, clavicle, shoulder, back, arms, legs, and neck. Mr. Faison also suffered bruising all across his body and extensive rectal hemorrhaging.

43. Detectives attending the autopsy of Armani Faison noted "a significant amount of blood came from the anus during examination."

## FAILURES OF THE PHILADELPHIA DEPARTMENT OF PRISONS

44. For years, the Philadelphia Department of Prisons has displayed a consistent and systemic failure to maintain proper staffing practices, resulting in a significant understaffing leading to an increase in inmate deaths directly related to the lack of supervision.

45. Prison Commissioner Blanche Carney and Wardens Michele Farrell and Nancy Gianetta have long been aware of the dangers created by their failure to maintain proper staffing.

46. Not only did the City of Philadelphia tolerate the escalating danger from their lack of staffing, Commissioner Carney went so far as to blame the issue on the general staffing shortages caused by the COVID-19, despite there being evidence that this practice existed long before the pandemic.

---

*PDP's Established Practice of Understaffing*

47.  According to the Philadelphia Office of the Controller, from 2019 to April of 2021 the PDP saw staff vacancies triple and conditions within the facilities become increasingly unsafe.[1]

48.  City Controller Rebecca Rhynhart expressed grave concern with staffing, stating:

> "The Department of Prisons is at a tipping point. Inadequate staffing levels have led to unsafe conditions for workers and confinement of inmates, many of whom are pre-trial, to their cells – sometimes for 20 or more hours a day... The City is responsible for the Department of Prisons' more than 1,500 correctional officers and approximately 4,600 inmates. We have a duty to provide safe working conditions and humane living conditions. The City must take an all-hands-on-deck approach to reach this hiring goal, with rigorous recruitment and multiple classes."

49.  This assessment was based data provided by PDP which showed that from 2019 – 2021, correctional staffing declined by 440 officers and only 119 new officers were hired within that same period. At the time of the statement, Rhynhart indicated that more than 300 COs were needed to meet adequate staffing.[1]

50.  The City of Philadelphia acknowledged the danger that the staffing shortages create, pointing to the five inmate on inmate homicides in PDP facilities from August 2020 – May 2021. A total that exceeded the prior eight years combined.[1]

51.  The *Philadelphia Inquirer*, frequently reported on the failures of the PDP, including an April 23, 2021 article that stated that there were shifts where as many as 14 of the 15 workers abandoned their shifts.[2]

52.  On May 19, 2021 it was reported that 64% of staff called out on Mother's Day weekend.[3]

---

[1] https://controller.phila.gov/controller-rhynhart-calls-for-staffing-increase-at-philadelphia-prisons-department-to-improve-safety-for-correctional-officers-and-inmates/
[2] https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html
[3] https://www.inquirer.com/news/philadelphia-department-prisons-lockdown-bail-fund-20210519.html

53. Commissioner Carney acknowledged that PDP was short 333 staff positions.[3]

54. This number continued to grow, and in June 2021 it was then reported that PDP was short 382 officers needed to operate safely.[4] By August 26, 2021 the gap had grown to 483 officers.

55. In an August 26, 2021 report, the Pennsylvania Prison Society executive Director Claire Shubik-Richards stated "we have been warning the city for months that the prison is dangerous, unconstitutional in its conditions, and past the boiling point."[4]

56. Correctional officers, including lieutenants, captains, and veterans of more than 20 years, told the *Inquirer* in October 2021 that the conditions in PDP facilities are the "worst they have ever seen."[5]

57. It was then reported that the number of staff needed to operate safely had grown to 500.

58. Highlighting the danger the danger in the Philadelphia Prisons is the fact that the PDP inmate population fell by 2% since 2019, yet over that same period seen staffing levels dropped by 28%.

59. On November 4, 2021, an analysis of PDP staffing rosters found that 20-30% of shifts on a given day were filled by officers and supervisors working overtime, and more than 40% of shifts listed were not filled at all.[6]

60. David Robinson, the president of the correctional officers' union, Local 159 of AFSCME District Council 33, stated that "we're in a situation where we don't have staff. That

---

[4] https://www.inquirer.com/news/philadelphia-prison-riot-cfcf-assault-20210826.html
[5] https://www.inquirer.com/opinion/commentary/philadelphia-prisons-correctional-officer-shortage-20211006.html#loaded
[6] https://www.inquirer.com/news/philadelphia-jails-staffing-shortage-assault-20211104.html

makes the prisons dangerous...they had an obligation to keep these jails safe. And I'm going to be honest: I believe they failed."

61. By the November report, the City Controllers officer claimed a 28% vacancy rate within PDP.

62. Commissioner Carney suggested then and has since continued to suggest that the COVID-19 pandemic is to blame, however at the same time the Pennsylvania Department of Corrections reported only a 5.6% vacancy rate.

### Powell v. City of Philadelphia

63. Understaffing has been a long-followed practice of the City of Philadelphia.

64. On November 4, 2004, then-Commissioner Leon King implemented a limited overtime policy for PDP officers, sparking significant under-staffing.

65. This understaffing led to an increase of violence in the jails and a deprivation of inmates rights, as well as federal litigation to resolve the issue.

### Remick v. City of Philadelphia

66. In April of 2020, ten incarcerated individuals within various facilities operated by the Philadelphia Department of Prisons filed a civil rights class action lawsuit against the City of Philadelphia and Prison Commissioner Blanche Carney over the conditions of the prisons and treatment of inmates by staff.

67. Understaffing within the Department of Prisons was identified in that litigation as the cause of most of the constitutional violations claimed.

68.  Judge Schiller ordered the City and Carney (hereafter "Defendants") through a partial settlement agreement dated June 3, 2020 to rectify certain failures including providing regular staff to maintain safe and optimal operations for inmates.

## Reports

69.  Throughout the entirety of the case there were frequent status reports regarding Defendant's compliance.

70.  A report dated September 24, 2020 concluded "according to an initial review of the staffing reports produced by Defendants, CFCF appears to have the greatest issue with staffing shortages, with many months reporting a shortage of over 100 staff. Of the five facilities, the housing units at CFCF report the most pervasive incidents of non-compliance with the Order." (9/24/2020 Report at pp. 3, 7-10).

71.  The report noted that due to staffing shortages there would be times when "no CO enters a unit for upwards of two hours at a time, leading to delayed response to fights or medical emergencies." (*Id.* at p. 3; fn 2).

72.  Within that same filing, Defendants acknowledged that "staff non-attendance has been an issue." (*Id.* at pp. 7, 11).

73.  On October 7, 2020, both parties convened for a joint status report where it was noted that the City and Commissioner admitted their failure to comply with he Court Order, citing staff shortages. (10/7/2020 Report at p. 2).

74.  Defendants acknowledged that at CFCF in particular, units would often face severe staff shortages for several days in a row which led to further the continued failure to comply with the order. (3/4/2021 Report at pp. 2, 7-8).

75.  A March 19, 2021 joint status report again pointed out insufficient staffing as the primary reason reported by both inmates and PDP administrators for the City's failures to provide for inmate needs. (3/19/21 Report at p. 1).

76.  Defendants cited "strenuous staff shortages" as the reason for their failure to allow inmates adequate out-of-cell time as required by the order. (*Id.* at pp. 2, 7-8).

77.  This status report also made clear that despite the City of Philadelphia, PDP, and Commissioner Carney all blaming general staff shortages on the COVID-19 pandemic that "these issues are limited to the security staff," and that other areas, such as medical staff, are not calling out or failing to show to their shifts in the way that COs are. (*Id.* at pp. 3-4).

78.  Within the April 8, 2021 report, it was made clear that the City, Commissioner Carney and the Wardens alike were aware that insufficient staffing would reasonably result in dangerous conditions, and that the failures had grown so severe that "there is no realistic prospect for the hiring of addition[al] correctional officers that will remedy these issues in the near-term. The price for this failure is being borne by incarcerated persons." (4/8/2021 Report at pp. 3, 17-18).

79.  Staffing issues continued to become more severe, being labelled a "staffing crisis" by PDP in the August 19, 2021 status report.

80.  Soon after, a September 9, 2021 status report again outlined the staffing crisis.

81.  It was found then through data provided to the Court that the PDP staffing crisis was "caused not only by high rates of staff absenteeism, but also by the City's failure to have sufficient numbers of corrections officers to properly staff PDP facilities," with no

---

"realistic plan for closing the gap in terms of correctional staffing." (9/9/2021 Report at p. 2).

82.  The PDP and the City continued to fall short of addressing their long-standing inadequate staffing, despite the repeated notices and prolonged dangers. (*Id.* at p. 2).

### Inmate Statements

83.  Between September 2020 and September 2021 inmates at PDP-run facilities provided declarations on their experiences within the prisons as part of the litigation.

84.  Across the board, inmates reported significant lack of staff resulting in the deprivation of their out-of-cell time, medication, mail, and proper supervision.

85.  On September 20, 2020, Jacquar J. Stokes, an inmate at CFCF, said in his declaration that he had experienced the negative impacts of CFCF's understaffing.

86.  Mr. Stokes stated that "insufficient staffing is a big impediment to our wellbeing. We are kept in our cells for days at a time and told this is because there are not enough COs on duty," noting that on the weekends "none" of the regular CO's report to their shifts.

87.  Another inmate at CFCF, Daniel Marshall, stated that on August 19, 21, 22, 24, and 26, 2020, inmates were not let out of their cells at all, with the only explanation on August 21st being that "not enough guards were present at the facility."

88.  Kenneth Clark, an inmate at CFCF, stated that on top of inadequate staffing generally, even the correctional officers that do come to their shifts sometimes would "leave for lunch and do not come back to let us out of our cells."

89.  Also on December 3, CFCF inmate Naeem Beyah stated that even though he is a block worker, he and other block workers are not permitted to leave their cells at times due to a lack of staff on the unit.

---

90. At the Philadelphia Industrial Correctional Center, another facility operated by PDP and Commissioner Blanche, inmate Tony Bizzell stated that there were also inadequate staff there resulting in dangerous and neglectful conditions, including on December 28, 2020 when Bizzell stated that another inmate committed suicide. Bizzell states that "I heard him asking for help several times before he died, but staff did not attend to him."

91. Detention Center, another PDP facility, also saw inmates neglected with one inmate saying that at one point they were not let out of their cell for 48 straight hours due to lack of staff. (Ex. 11, P. 10; 4)

92. Karren Sprual, another CFCF inmate, claimed in his declaration that "staff tells us that there are not enough correctional officers to have rovers on each unit." Rovers are staff members that move between units as additional assistance and support.

93. It was also reported by inmates that at times there would be a complete absence of officers, with one inmate at CFCF claiming that there were often no officers on their block at all during the 3 pm – 11 pm and 11 pm – 7 am shifts.

94. CFCF inmate John Hart further corroborated the lack of CO's, stating that "it has become commonplace to go large stretches of time without seeing COs on our unit."

*Inmate Emergencies and Violence Ignored*

<u>Dale Curbeam</u>

95. On January 15, 2021, 60-year-old Dale Curbeam was found face down in his cell at CFCF.

96. Curbeam was pronounced dead just a few minutes after being discovered. The cause of death was ruled a homicide by blunt impact head trauma. Curbeam's cellmate was arrested in connection with the murder.

97. According to a report by the *Inquirer*, only one staffer was assigned when Curbeam was murdered.[7]

### Christopher Hinkle

98. Christopher Hinkle was arrested for a minor drug charge but was unable to pay his bond. He was sent to CFCF, where he was housed on the same cellblock as Mr. Faison.[8]

99. On April 12th, Mr. Hinkle was beaten by his cellmate in a brutal, prolonged attack.

100. Hinkle sustained a broken neck among other blunt injuries.[9]

101. Hours passed before Hinkle was discovered.

102. The delay in discovering Hinkle rendered him unsavable. Once found, he was put on life support before he died.[10]

103. Hinkle's cellmate reportedly admitted to the assault. The cellmate had a long record of random assaults and violent criminal offenses, most of which appeared unprovoked.[11]

104. Hinkle was a non-violent offender.

### Rashaan Chambers

105. In April of 2021, Rashaan Chambers was an inmate at CFCF.[12]

106. On April 6, Chambers attempted to get medical care for his diabetes but was reportedly denied.[13]

---

[7] https://www.inquirer.com/news/homicide-philadelphia-jails-violence-covid-pandemic-lockdowns-20210120.html
[8] https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html
[9] https://6abc.com/philly-jail-death-christopher-hinkle-murder-inmate-killed/10669008/
[10] https://philadelphia.cbslocal.com/2021/05/21/christopher-hinkle-philadelphia-prison-death-rameel-wright/
[11] https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html
[12] https://www.inquirer.com/news/philadelphia-department-prisons-lockdown-bail-fund-20210519.html
[13] https://nwlocalpaper.com/injustice-is-blind

107. According to his mother, Chambers reported that no guards checked on him during the night nor did they complete morning checks.

108. Feeling ill, Chambers did not go out of his cell for recreation time on April 7, but this did not alert staff to check on him. Staff reportedly did not seek care or check on Chambers until his family complained.

109. Chambers was eventually taken to the hospital.

110. On April 16 at 8:42 a.m., Chambers was pronounced dead from complication of diabetic ketoacidosis.

111. Despite there being a clear need for assistance, Chambers was ignored until his condition was too severe to survive.

<u>Eli Rosa</u>

112. In a 2021 letter, Eli Rosa described the lack of correctional officers at CFCF where he was an inmate.

113. Rosa wrote: "I've done had seizures, fights and fell off my bunk, and no C/O was around to help me get medical attention."[14]

<u>Quincy Day-Harris</u>

114. On August 25, 2021 at the Detention Center, operated by PDP, 25 year old inmate Quincy Day-Harris died by suicide.[15]

---

[14] https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html
[15] https://www.inquirer.com/news/philadelphia-prison-riot-cfcf-assault-20210826.html

115. According to his family, Day-Harris suffered from paranoid schizophrenia which was well documented through previous times when the jail had admitted him to the hospital for psychiatric purposes.

116. Day-Harris's family feels that the jail did not provide adequate oversight despite knowing that Day-Harris had documented mental health needs, resulting in his death.

Unknown Inmate #1

117. Norman Cooper, an inmate in CFCF's custody, reported that in 2020 an unknown inmate on his cell block committed suicide.[16]

118. It is alleged that due to insufficient staffing leading to guards not checking on cells, the unknown inmate was left hanging for several hours.

119. According to Cooper, the cellmate of the unknown inmate was banging on their cell for hours trying to summon help. The calls went unanswered

Unknown Inmate #2

120. On September 30, 2021, an unknown inmate at CFCF was repeatedly beaten and stabbed by three other inmates.[17]

121. There were no guards on the cell block.

122. The unknown inmate, with no help available, staggered back to his cell as other inmates mopped up the blood.

---

[16] https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html
[17] https://www.inquirer.com/news/philadelphia-jails-staffing-shortage-assault-20211104.html

## WRONGFUL DEATH ACTION

123. Plaintiff brings this action pursuant to the Wrongful Death Act of the Commonwealth of Pennsylvania, 42 Pa.C.S.A. § 8301, to recover damages as a result of the wrongful death of Armani Faison.

124. No other action has been brought to recover for Armani Faison's death under the aforementioned statute.

125. Plaintiff claims all available damages under the Wrongful Death Act of the Commonwealth of Pennsylvania for financial contributions and the loss of future services, support, society, comfort, affection, guidance, tutelage, and contributions and the Plaintiff's decedent, Armani Faison, would have rendered to the wrongful death beneficiaries but for his traumatic, untimely and unnatural death occurring as a result of the unlawful acts and omissions which are subject to the present litigation.

126. Plaintiff claims damages for all medical bills and/or expenses.

127. Plaintiff claims all damages for payment of funeral or burial expenses.

## SURVIVAL ACTION

128. Plaintiff hereby incorporates all preceding paragraphs as is fully stated herein.

129. Plaintiff brings this action pursuant to the Pennsylvania Survival Statute, 42 Pa.C.S.A. §8302, for all recoverable damages under the Statute, including but not limited to loss of earnings, loss of earning power, loss of earning capacity, pain and suffering and emotional distress.

---

## COUNT I: FOURTEENTH AMENDMENT
### AGAINST ALL INDIVIDUAL DEFENDANTS

130. Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

131. As set herein, this is a civil rights action brough pursuant to 42 U.S.C. § 1983 that challenged the unconstitutional actions of the Defendants that resulted in the rape and murder of Armani Faison.

132. At all relevant times hereto, Defendants were "persons" acting under color of state law.

133. The Fourteenth Amendment imposes on Defendants the obligation to take reasonable measures to protect pretrial detainees from violence at the hands of other inmates.

134. As explained above, Defendants failed in their obligation at every turn.

135. Defendants' conduct exposed Armani Faison to a substantial risk of harm.

136. Defendants knew of and were deliberately indifferent to those known risks.

137. As a result of Defendants deliberate indifference, Armani Faison was raped for hours and subsequently murdered.

138. Defendants were in direct violation of the Fourteenth Amendment, as well as their own policies, when they recklessly, willfully and with deliberate indifference facilitated the move of a known-dangerous inmate into the same cell as Mr. Faison, all while knowingly being too understaffed to provide adequate supervision.

139. While acting under color of state law, Defendants affirmatively created the danger that led to Mr. Faison's death by:

    a.  Failing to maintain appropriate staff in the inmate housing units;

    b.  Placing Mr. Faison in a cell with inmate Kevin Massey despite knowledge of his sexual assault of his previous cellmate;

_____

    c.   Failing to have a corrections officer on Mr. Faison's cell block;

    d.   Failing to conduct regular checks of the cells housing inmates for several hours;

    e.   Failing to respond to repeated asks for help by Mr. Faison and neighboring inmates;

    f.   Failing to adequately protect Mr. Faison from fatal injuries while in their custody and control; and,

    g.   Willfully subjecting Mr. Faison to repeated physical and psychological torture and ultimately his death, described herein.

140. The danger created by the Defendants as set forth above was foreseeable and direct, and through their failures, willful disregard, and deliberate indifference to Mr. Faison's safety, Defendants acted with a degree of culpability that shocks the conscience.

141. Defendants acts and omissions caused Mr. Faison to suffer extreme and severe physical and emotional distress, terror, agony, and ultimately were the direct and proximate cause of his death.

    **WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendants Carney, Gianetta, Farrell, and John Does #1-3 pursuant to 42 U.S.C. § 1983, in an amount in excess of Twenty Million Dollars, including interest, delay damages, costs of suit, general and specific damages including both survival and wrongful death damages, punitive damages, attorneys' fees under 42 U.S.C. § 1985 and 1988, and any other damages legally appropriate at the time of a jury trial.

### COUNT II: FOURTEENTH AMENDMENT MUNICIPAL LIABILITY
**AGAINST DEFENDANT THE CITY OF PHILADELPHIA**

142. Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

_____

143. The customs, practices, and policies of the City of Philadelphia were a moving force behind the violation of Armani Faison's constitutional rights.

144. Mr. Faison was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, and by the City of Philadelphia through its many failures addressed *supra*.

145. Policymakers and authoritative figures knew of the failures of the Philadelphia Department of Prisons as discussed herein but failed to take the necessary steps to rectify the failures and adequately protect the constitutional rights of the inmates in their custody and control.

**WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendant the City of Philadelphia, pursuant to 42 U.S.C. § 1983, in an amount in excess of Twenty Million Dollars, including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, attorneys' fees under 42 U.S.C. § 1985 and 1988, and any other damages legally appropriate at the time of a jury trial.


<u>COUNT III: NEGLIGENCE</u>
AGAINST DEFENDANT THE CITY OF PHILADELPHIA

146. Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

147. As a direct and sole result of the careless, reckless and negligence of Defendant City of Philadelphia, Decedent Armani Faison suffered prolonged torture and eventual death.

148. The brutal death of Mr. Faison was the direct and proximate result of the negligence of Defendant City of Philadelphia.

149.  The Defendant had a duty or obligation to conform to a standard of conduct, including maintaining adequate staff, and failed to do so, and this failure was the direct and proximate cause of Mr. Faison's murder.

150.  The Defendant failed to maintain adequate staff despite being put on notice many times since 2004.

151.  Defendant's immunity is waived pursuant to 42 Pa.C.S. § 8542(b)(9).

**WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendant the City of Philadelphia in an amount in excess of Twenty Million Dollars, including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, and any other damages legally appropriate at the time of a jury trial.


Respectfully submitted,

MCELDREW YOUNG PURTELL MERRITT                    THE ROGERS LAW FIRM

/s/ JOHN J. COYLE
John J. Coyle, Esq.                                               Allen Rogers, Esq.*
Daniel N. Purtell, Esq.                                          Victoria Clarkson, Esq.*
Mark V. Maguire, Esq.                                         111 Person Street
123 South Broad Street                                        Fayetteville, NC 28301
Suite 2250                                                            t: (910) 433-0833
Philadelphia, PA 19109
t: (215) 545-8800                                               *Pro Hac Vice Application Forthcoming
jcoyle@mceldrewyoung.com
dan@mceldrewyoung.com
mmaguire@mceldrewyoung.com