IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLRICH JEAN, as Administrator for the Estate of ARMANI FAISON<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PHILADELPHIA, *et al.*,<br><br>Defendants. | Case No. 2:22-cv-00433 |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO THE MOTION TO DISMISS**

Date: January 6, 2023

John J. Coyle, Esq.
Mark V. Maguire, Esq.
MCELDREW PURTELL
123 S. Broad St. Suite 2250
Philadelphia, PA 19109

Allen Rogers, Esq.
THE ROGERS LAW FIRM, PLLC
111 Person St.
Fayetteville, NC 28301

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................4, 9

*Bd. of Cty. Comm'rs of Bryan Cty v. Brown*, 520 U.S. 397 (1997) ................................................6

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................4

*Bell v. Wolfish*, 441 U.S. 520, 535 (1979) .......................................................................................4

*Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012) ..............................................................................5, 6

*Bond v. Nueces County*, 2022 U.S. App. LEXIS 27460, 2022 WL 4595000; No. 20-40050 (5th Cir. 2022) .............................................................................................................................................10

*Colburn v. Upper Darby Twp.*, 838 F.2d 663 (3d Cir. 1988) ..........................................................4

*Deshaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989) ..................................5

*Estelle v. Gamble*, 429 U.S. 97 (1976) ............................................................................................5

*Farmer v. Brennan*, 511 U.S. 825 (1994) ....................................................................................5, 8

*Goka v. Bobbitt*, 862 F.2d 646 (7th Cir. 1988) ................................................................................9

*Gonzalez v. Martinez*, 403 F.3d 1179 (10th Cir. 2005) ...................................................................8

*Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991) .......................................................................10

*Hedges v. United States*, 404 F.3d 744 (3d Cir. 2005) ....................................................................4

*Kehr Packages, Inc.v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir. 1991) ..............................................4

*LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993) ......................................................................8

*Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658 (1978) ...................................6, 8

*Mulholland v. County of Berks*, 706 F.3d 227 (3d Cir. 2013) .........................................................6

*Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009) ........................................................6

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008). ..........................................................4

*Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980) ...........................................................................10

*Scott v. Moore*, 114 F.3d 51 (5th Cir. 1997). ................................................................................10

*Shorter v. United States*, 12 F.4th 366 (3d Cir. 2021) ............................................................5, 6, 8

*Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720 (3d Cir. 1989). .........................................7, 8

*Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008) .......................................................................8, 9

*Youngberg v. Romeo*, 457 U.S. 307 (1982) .....................................................................................5

**Rules**

Rule 12(b)(6) ............................................................................................................................. 3

**Treatises**

5 Wright and Miller, *Federal Practice and Procedure* § 1357 (1969) ............................................. 4

## TABLE OF CONTENTS

| | | |
|---|---|---:|
| I. | FACTUAL BACKGROUND | 1 |
| | A. The Rape and Murder of Armani Faison | 1 |
| | B. Understaffing at CFCF | 2 |
| II. | LEGAL STANDARD | 3 |
| III. | ARGUMENT | 4 |
| | A. The Fourteenth Amendment and the failure to protect | 4 |
| | B. The standard for municipal liability | 6 |
| | C. Plaintiff has pled facts to support municipal liability for inadequate staffing | 6 |
| | D. The City exhibited deliberate indifference | 7 |
| IV. | CONCLUSION | 11 |

Armani Faison was arrested for shoplifting and being held as a pretrial detainee when he was placed in a cell with Kevin Massey who just hours before had attempted to rape his prior cellmate. After locking Faison in the cell, the City of Philadelphia abandoned him to protect himself. The City removed all corrections officers from the cell block as a result of their practice and custom of understaffing the facility. Unsurprisingly, the sexually violent Massey used the opportunity to violently and repeatedly rape Armani Faison to death. For hours, Mr. Faison's pleas for help and those of nearby inmates went unanswered because the City of Philadelphia left the cell block completely unguarded. The City and Commissioner Carney now ask this Court to excuse them from liability for the vicious rape and murder of Armani Faison despite their abject failure to ensure

I.     FACTUAL BACKGROUND

A. *The Rape and Murder of Armani Faison*

In the early morning hours of March 24, 2021, Kevin Massey, an inmate as CFCF, sexually assaulted his cellmate K.S. (Am. Compl. ¶¶ 16-18.) The sexual assault was reported to Defendant Barbour. (*Id.* at ¶ 19.) Initially, Massey was removed from the cell and per prison policy should have been placed in segregation status. (*Id.* at ¶ 21.) On that same date, Armani Faison was arrested for shoplifting and after being unable to post bail, he was sent to CFCF where he was assigned to Cell #10 on B1 Pod 2. (*Id.* at ¶¶ 21-22.)

Shortly after Armani Faison was assigned to Cell #10, Defendant Barbour returned Kevin Massey to Cell #10. (*Id.* at ¶ 21.) That night, the lights were turned out around 12AM. (*Id.* at ¶ 28.) Shortly thereafter, the lone corrections officer assigned to the cell block, Defendant Carter, exited the block, leaving it completely unsupervised in any form for up to seven hours. (*Id.* at ¶¶ 34-36.) After Carter left the cell block, Massey began raping Armani Faison. (*Id.* at ¶ 30.) The

assault lasted for hours, during which time Faison repeatedly screamed for help. (*Id.* at ¶ 30.) Other inmates nearby, also loudly banged on their cells and screamed for help.  (*Id.* at ¶ 41.) However, all the pleas, bangs, and screams went unanswered because the City failed to staff the cell block.  (*Id.* at ¶¶ 38-42.)  The next morning at 7:38AM a shift change occurred and C.O. Melton upon beginning his rounds found Armani Faison naked and unresponsive, face down in several inches of water. (*Id.* at ¶¶ 42-45.) Armani Faison was pronounced dead at Nazareth Hospital at 9:45AM. (*Id.* at ¶ 46.)

   B.   *Understaffing at CFCF*

Beginning in 2019, the City of Philadelphia failed to staff the Philadelphia Department of Prisons at levels necessary for the safety of inmates and staff. (*Id.* at ¶¶ 52-54.)  The result was obvious, violence and murders in the PDP facilities skyrocketed with five murders occurring between August 2020 – May 2021, more than in the previous eight years combined.  (*Id.* at ¶ 55.) The City was well aware in 2019 and 2020 of the insufficient staffing levels as indicated by the Department's own staffing data from 2019 onward (*Id.* at ¶ 54.), the Comptroller's report (*Id.* at ¶¶ 52-54.), and reports filed by the City in the *Remick v. City of Philadelphia* litigation (*Id.* at ¶¶ 74-78; *See also*, E.D. Pa. Civ. No. 2:20-cv-01959 at ECF No. 45 at p. 5, l. 8-11; ECF No. ) These chronic staffing shortages predated the COVID-19 pandemic and were the result of the long-term failure of the City to recruit and hire adequate numbers of corrections officers.  (*See* E.D. Pa. Civ. No. 2:20-cv-01959 at ECF No. 46 at p. 3, L. 3-9.)  Indeed, by October 2, 2020, the City had admitted to violating a federal court order blaming staffing shortages.  (Am. Compl. at ¶ 78.)

The City acknowledged in court filings as early as September 24, 2020, that there would be times when "no CO enters a unit for upwards of two hours at a time, **leading to delayed response to fights or medical emergencies**." (Am. Compl. at ¶ 76.)  Furthermore, the City was

well aware that allowing cell blocks to go unstaffed would lead to violence and death, as former CFCF Warden John Delaney stated, "At no time should a housing area in any facility within the Philadelphia Department of Prisons be left unmanned for any extended period of time. **This not only compromises the health and welfare of the inmates assigned to the area,** but it also jeopardizes the safety and security of the facility and places staff in unnecessary risk." (*Id.* at ¶ 2.) Indeed, the City's own post plan and its contract with the Corrections Officer Union required that all cell blocks in CFCF be manned by two officers at all times. (*Id.* at ¶ 32.)  It is clear that between the City's own contract and post plan, the Comptroller's report, the *Remick* litigation, and the multiple incidents cited in the Amended Complaint, City policymakers knew that the insufficient staffing levels were resulting in the inability to protect individuals from inmate violence.[1]

The most troubling part of this situation is that despite knowing of massive staffing shortfalls and the related violence in CFCF and the Department of Prisons generally, the City failed to even attempt to take any steps to rectify the problem until April of 2021 (after Armani Faison's death) when they began "continuous hiring and recruiting processes to fill their current vacancies" and approached union leadership "to request a change to PDP staffing operations – 12 hour shifts – that would result in additional correctional officers being in the facilities."  (*See* E.D. Pa. Civ. No. 2:20-cv-01959 at ECF No. 68 at p. 4-5.)

II.     LEGAL STANDARD

Under Rule 12(b)(6) a defendant may motion a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Motions to dismiss are viewed with disfavor

---

[1] This obvious conclusion does not require specialized knowledge but was nonetheless also explicitly stated by corrections officers' union president David Robinson, "we're in a situation where we don't have staff. **That makes the prisons dangerous…[the City] had an obligation to keep these jails safe.** And I'm going to be honest: I believe they failed." (Am. Compl. at ¶ 65.)

and as such, are rarely granted. 5 Wright and Miller, *Federal Practice and Procedure* § 1357 (1969). To defeat a 12(b)(6) Motion, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In resolving a Rule 12(b)(6) motion to dismiss, the Court accepts all pleaded facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). The claims must be facially plausible, meaning that the pleaded facts "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Id.* The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

### III.    ARGUMENT

#### A. The Fourteenth Amendment and the failure to protect

Claims involving the conditions of pre-trial detention are properly analyzed under the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979). A detainee is entitled to "at a minimum, no less protection for personal security than that afforded convicted prisoners under the Fourteenth Amendment and no less a level of medical care than that required for convicted prisoners by the Eighth Amendment." *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 668 (3d Cir. 1988). The Fourteenth Amendment imposes on

government officials a duty to assume responsibility for a detainee's safety and general well-being. *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982). "The affirmative duty to protect arises… from the limitation [the state] has imposed on [a detainee's] freedom to act on his own behalf." *Deshaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

Government officials are required to take reasonable measures to guarantee the safety of detainees:

> Under our case law and the Supreme Court's longstanding precedent in *Farmer*, **a prisoner has a clearly established constitutional right to have prison officials protect him from inmate violence** and has a damages remedy when officials violate that right.

*Shorter v. United States*, 12 F.4th 366, 373 (3d Cir. 2021) (cleaned up) (emphasis added); see also, *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) ("*Bistrian I*"). Prison officials, therefore, are liable for displaying deliberate indifference to a substantial risk that a pretrial detainee will be attacked by other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Where, like here, a plaintiff alleges facts showing "that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842-843.

Against this backdrop, the Third Circuit has outlined the three components necessary to present a failure to protect claim. A detainee must plead facts that show (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately

indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm. *Shorter*, 12 F.4th at 374 (citing *Bistrian I*, 696 F.3d at 367).

B. *The standard for municipal liability*

At the pleading stage, a plaintiff must allege facts that demonstrate that a constitutionally protected right was violated and that the alleged violation resulted from a municipal policy, practice, or custom that exhibits deliberate indifference to the rights of citizens. *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 694-695 (1978). To ultimately prevail on a *Monell* claim, a plaintiff bears the burden of identifying "a municipal policy or custom that caused the plaintiff's injury." *Bd. of Cty. Comm'rs of Bryan Cty v. Brown*, 520 U.S. 397 (1997). A policy occurs when a decisionmaker with final authority "issues an official proclamation, policy, or edict," while a custom occurs when practices are "so permanent and well-settled as to virtually constitute law." *Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013). Indeed, liability will be found where a practice is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

C. *Plaintiff has pled facts to support municipal liability for inadequate staffing*

Plaintiff has pled facts which demonstrate a City custom of understaffing that led to cell blocks being left completely unguarded and Plaintiff has pled facts demonstrating that the City (1) was aware of the understaffing levels, (2) was aware of the increased violence as a result of the understaffing, and (3) took no action to alleviate the dangerously low staffing levels until April of 2021, after Armani Faison's rape and murder. Individual defendants who are policymakers may be held liable under § 1983 if it is shown that the defendant "with deliberate indifference to the consequences, established and maintained a policy, practice, or custom which

directly caused the constitutional harm."[2] *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989). A municipality is liable for a violation of a constitutional right if the plaintiff can identify a policy or custom of the entity that caused the constitutional violation. *A.M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004). A plaintiff can establish causation by demonstrating that the municipal action was taken with deliberate indifference to its known or obvious consequences. *Id.* "As long as the causal link between the alleged policy or custom and the constitutional injury is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Id.* at 581.

Here, Plaintiffs have identified a custom of understaffing the prisons that began in at least 2019 and continued through Armani Faison's death. The understaffing resulted in cell blocks regularly being left unguarded resulting in increased risks of violence and slower responses to stop inmate violence. All of these facts are laid out in the Amended Complaint and were admitted to by the City in the *Remick* litigation. The custom of understaffing led Armani Faison to be housed on a cell block that was left completely unguarded resulting in a multi-hour rape and murder without intervention.

D.  *The City exhibited deliberate indifference*

Defendants argue that the Amended Complaint "fails to allege a specific policy or custom on the part of the City ... from which a plausible inference can be drawn that the City *deliberately* understaffed CFCF or any PDP facility." *See* Mt. at p. 8. However, this argument misrepresents the law. The law requires Plaintiff to demonstrate that the City maintained a custom of understaffing in deliberate indifference to the rights of detainees. *A.M. v. Luzerne County Juvenile*

---

[2] Defendants Carney, Giannetta, and Farrell concede that they are policymakers for purposes of this Motion. *See* Mt. to Dismiss at fn. 2.

*Det. Ctr.*, 372 F.3d 572, 579 (3d Cir. 2004); *Shorter*, 12 F.4th at 374; *Monell*, 436 U.S. at 694; *Stoneking*, 882 F.2d at 725. Deliberate indifference requires only that the policymaker be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists… The official's knowledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (citing *Farmer*, 511 U.S. at 837-843). "It does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of assault for reasons personal to him or because all prisoners in his situation face such a risk." *Gonzalez v. Martinez*, 403 F.3d 1179, 1187 (10th Cir. 2005). If a policymaker is aware of a substantial risk of serious harm to inmates, he is deliberately indifferent unless he takes reasonable steps to alleviate that risk. *Tafoya*, 516 F.3d at 916 (citing *LaMarca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993))..

      Although deliberate indifference is a subjective inquiry, the fact finder is permitted to infer a policymaker "had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Id.* (citing *Farmer*, 511 U.S. at 842). Here, the pleadings clearly spell out that the custom of understaffing began at least in 2019 and was known to prison officials through their own data, the Comptroller's investigation, the *Remick* litigation, and the massive uptick in violence in the prison. While the risk to inmates of leaving cell blocks unguarded is obvious, it was nonetheless admitted by the City as well. Despite this, the City failed to take any reasonable steps to alleviate these risks until April 2021, after Armani Faison was raped and murdered.

      Additionally, deliberate indifference can be inferred from the City's failure to enforce its own post policies and collective bargaining agreement. "The knowing failure to enforce policies

necessary to the safety of inmates may rise to the level of deliberate indifference." *Id.* at 919 (citations omitted). Deliberate indifference will lie "where defendants know of the danger or where the threat of violence is so substantial or pervasive that their knowledge could be inferred, and yet defendants fail to enforce a policy or take other reasonable steps which may have prevented the harm." *Goka v. Bobbitt*, 862 F.2d 646, 651 (7th Cir. 1988). The City maintains post policies which require two guards on each block at all times for inmate and staff safety. This is also reflected in the City's collective bargaining agreement with the corrections officers' union. The contractual and policy redundant requirements of two guards at all times underscores the safety requirement of adequately staffing the cell blocks. Allowing cell blocks to go completely unguarded for up to seven hours is unconscionable in modern corrections. Nonetheless, Defendant Carney failed to enforce these policies and agreements despite her knowledge that they are designed for inmate safety.

The City Defendants additionally rely on this Court's opinion in *Diaz v. City of Philadelphia*; Civ. No. 22-3286 (ECF No. 16.) to argue that Plaintiff's must plead that the City made a deliberate choice to understaff the prisons. City Defendants likely rely on the *Diaz* opinion's focus on two interrelated issues. First, the Court concluded that "mere knowledge of difficulties hiring and retaining enough employees is not the same as a policy to routinely hire fewer corrections officers than are needed to maintain a safe premises." Second, the Complaint in that matter must be dismissed because the plaintiffs failed to allege facts "that there was a particular course of conduct in which, for instance, the hiring body for the Philadelphia Department of Prisons chose to hire fewer prison guards than were required." Op. at 13. Unfortunately for Defendants, the *Diaz* opinion both misses the mark on the custom at issue in this matter, and is unsupported by precedent and, is in fact, contradicted by the existing precedent of this Circuit

and others.

First, it is not the failure to hire sufficient prison guards that is the custom at issue in this case, rather the custom is the City's chronic failure to staff the prison with an adequate number of guards to ensure inmate safety – a multi-year failure that violates the City's own post policy and its collective bargaining agreement resulting in five murders and an exponential increase in assaults. This failure is, of course, comprised in part of the failure to hire sufficient guards, but also encompasses the failure to retain existing guards, the failure to alter recruiting and hiring techniques to increase the number of academy classes, the failure to outsource correctional operations, and the failure to negotiate staffing procedures to guarantee adequate levels, among others. This is underscored by the City's own efforts in April 2021 to rectify the inadequate staffing by altering shift hours and beginning rolling recruitment and hiring. (*See* E.D. Pa. Civ. No. 2:20-cv-01959 at ECF No. 68 at p. 4-5.)

Additionally, the focus of the *Diaz* opinion on whether there was a conscious decision to hire an insufficient number of guards is inconsistent with existing precedent. Throughout undersigned counsel's research, there are no other cases that require a plaintiff to plead that there was a course of conduct chosen by the hiring body to hire insufficient guards. Rather, all of the cases dealing with understaffing focus on the outcome of the practice, whether it results in the denial of constitutional rights, and whether those constitutional violations are obvious enough or frequent enough to indicate a deliberate indifference by prison authorities to the suffering that results. *See, e.g., A.M.*, 372 F.3d at 581; *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991); *Ramos v. Lamm*, 639 F.2d 559, 577-578 (10th Cir. 1980); *Bond v. Nueces County*, 2022 U.S. App. LEXIS 27460, 2022 WL 4595000; No. 20-40050 (5th Cir. 2022); *Scott v. Moore*, 114 F.3d 51, 54-55 (5th Cir. 1997). In none of these cases were plaintiffs required to demonstrate a conscious decision to

hire an inadequate number of staff.

Here, Plaintiff has pled facts demonstrating: (1) the City had a custom of understaffing its prisons beginning at least in 2019; (2) policymakers were aware of the understaffing and the resultant obvious increased risk of inmate violence; (3) policymakers were aware of specific acts of increased violence resulting from the inadequate staffing levels; and (4) policymakers took no action to rectify the staffing issues until April 2021, after Armani Faison was raped and killed. Plaintiff has adequately pled that the City and its policymakers maintained a custom which was the moving force behind the violation of Armani Faison's constitutional rights. As such, the Motion to Dismiss should be denied.

IV.   CONCLUSION

Wherefore, for the reasons stated herein, Plaintiff respectfully requests an Order denying the Motion to Dismiss.

    Respectfully submitted,

    /s/ John J. Coyle
    John J. Coyle, Esq.
    Mark V. Maguire, Esq.
    MCELDREW YOUNG PURTELL MERRITT
    123 S. Broad St. Suite 2250
    Philadelphia, PA 19109

    Allen Rogers, Esq.
    THE ROGERS LAW FIRM, PLLC
    111 Person St.
    Fayetteville, NC 28301

Date: January 6, 2023

## CERTIFICATE OF SERVICE

I certify that the foregoing Response in Opposition to Defendants' Motion to Dismiss was filed electronically with the Court's electronic filing system and thereby served upon all counsel of record.

/s/ John J. Coyle